ORDERED in the Southern District of Florida on **DEC 23 2010**



_____
Erik P. Kimball, Judge
United States Bankruptcy Court

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

In re:                                                         Chapter 11

CAMTECH PRECISION MANUFACTURING, INC.,        Case No.: 10-22760-PGH
R & J NATIONAL ENTERPRISES, INC. and
AVSTAR FUEL SYSTEMS, INC.,                              (Jointly Administered)

        Debtors.
_____/

### ORDER GRANTING DEBTOR'S MOTION FOR ENTRY OF AN ORDER (A) APPROVING BIDDING PROCEDURES; (B) APPROVING THE FORM OF NOTICE OF SALE; (C) SCHEDULING AN AUCTION TO ACCEPT HIGHER AND BETTER BIDS; AND (D) SCHEDULING HEARING TO CONSIDER APPROVING SALE ARISING OUT OF AUCTION PURSUANT TO 11 U.SC. § 363

THIS MATTER came before the Court for hearing on December 20, 2010, upon

CAMtech Precision Manufacturing, Inc.'s (the "**Debtor**") Motion for entry of an Order (a)

authorizing and scheduling the sale of substantially all of the Debtor's assets free and clear of all

liens, claims, and encumbrances; (b) approving the Asset Purchase Agreement with Camtech

Acquisition, LLC; (c) authorizing Debtor to enter into the Asset Purchase Agreement with

Camtech Acquisition, LLC; (d) approving the break up fee to Camtech Acquisition, LLC as

1

stalking horse bidder; (e) approving bidding procedures; (f) approving the notice of sale; (g) approving the break up fee to stalking horse bidder; (h) scheduling an auction to accept higher and better bids; and (i) scheduling a hearing to approve the sale arising out of the auction, pursuant to 11 U.S.C. § 363, Rules 2002, 6004(a) and 9014 of the Federal Rules of Bankruptcy Procedure and Local Rule 6004-1 (the "**Sale Procedure Motion**") (D.E. 218). The only matters considered by the Court at the December 20, 2010 hearing concerned the bidding procedures to be employed relative to the proposed sale of the assets and liabilities described in the Sale Procedure Motion, along with other matters discussed in detail below. The Court, having reviewed the Sale Procedure Motion, taken judicial notice of the case file in its entirety, being otherwise duly advised in the premises, and good cause having been shown, does **FIND** and **CONCLUDE** as follows:

A.      The Court has jurisdiction over this case pursuant to 28 U.S.C. § 1334, and this matter constitutes a core proceeding under 28 U.S.C. § 157(b);

B.      Written notice of the Sale Procedure Motion has been provided to all interested parties entitled to receive notice under the Federal Rules of Bankruptcy Procedure; and

C.      The Debtor has relied upon sound and adequate factual and legal bases in support of the relief sought in the Sale Procedure Motion raised at this hearing.

Accordingly, the Court does **ORDER** and **ADJUDGE** as follows:

1.      The Sale Procedure Motion is **GRANTED as set forth herein**.

2.      The sale notice attached to the Sale Procedure Motion as Exhibit "B" is **APPROVED** subject to the terms and conditions of this Order.

3.      The Purchaser shall pay the Debtor a deposit in the amount of $100,000 within 7 days of the entry of this Order. Such deposit will either be (a) applied to the Purchaser Price in

2

the event the Purchaser is the successful bidder and closes on the sale of the Assets, (b) refunded to Purchaser in the event a third party outbids the Purchaser and ultimately closes on the sale of the Assets, or (c) retained by the Debtor as liquidated damages in the event the Debtor terminates the APA as a result of an uncured breach by Purchaser.

4.      The Breakup Fee is **APPROVED IN PART AND DENIED IN PART** in that it is reduced to the amount of actual expenses incurred relating to the Sale up to a maximum dollar amount of $150,000.00.  The Purchaser shall only receive the Breakup Fee if (a) a third party outbids the Purchaser and ultimately closes on the sale of the Assets pursuant to the terms of these Bidding Procedures, or (b) the Debtor defaults for reason other than (i) not obtaining or achieving the minimum revenue targets required under Section 8.8 of the APA or the customer retention requirements set forth in Section 8.9 of the APA or (ii) a material adverse change in the Debtor's business occurs.  The final approval and payment of any Breakup Fee shall be subject to further Court approval after notice and hearing.

5.      The deadline for all parties to complete due diligence is **January 12, 2011**.

6.      Importantly, certain assets (the "Excluded Assets") shall be excluded from the Sale as detailed in § 2.2 of the APA.

7.      The purchaser of the Assets shall, pursuant to the terms of the APA, assume certain liabilities as detailed in § 2.3 of the APA.

8.      A person may be qualified to participate in the Auction if by the bid deadline of **January 12, 2011** (the "**Bid Deadline**"), the following are provided:

(a)      A deposit of $100,000.00 (the "**Deposit**") payable by bank cashier's check or wire transfer into the non-interest bearing escrow account of Shraiberg, Ferrara & Landau, P.A. along with the EIN or other tax identification number of the bidding person or entity;

(b)      An executed asset purchase agreement and a redline version showing changes

3

from the APA attached hereto as **Exhibit "A."** Any competing bid must not contain any contingencies to the validity, effectiveness and/or binding nature of the offer, including without limitation, contingencies for financing, due diligence or inspection;

(c)    The amount the person is willing to pay for the Assets, but in no event shall this amount be less than the Purchase Price as set forth in the APA, plus an additional amount in cash of $155,000.00 (the **"Initial Bid"**); and

(d)    Reasonable financial information from which the Debtor can assess the financial wherewithal and sophistication of the bidder to close on the Sale in the event that the bidder is the Successful Bidder. Such information shall include, at a minimum, financial statements, bank account statements or other documents of such entity (including information on any third-party funding required to consummate and perform under the Asset Purchase Agreement) establishing such entities financial wherewithal to timely close the transactions contemplated thereunder.

(e)    A letter setting forth the identity of the Potential Bidder, the contact information for such Potential Bidder, and full disclosure of all parties participating with the Potential Bidder, as well as full disclosure of any prepetition and postpetition affiliation that the Potential Bidder may have with (i) the Debtors, (ii) Debtor's affiliates, (iii) major creditors of the Debtor, (iv) equity security holders of the Debtors, and (v) any of the Debtor's former officers or directors or other insiders; and

(f)    An executed letter acknowledging receipt of a copy of the Bidding procedures and agreeing to accept and be bound by the provisions contained therein.

(collectively, the **"Qualifying Bid Packet"**). The Qualifying Bid Packet must be delivered with

the items described above no later than **5:00 p.m. E.S.T. on January 12, 2011** to:

(a)    Bradley S. Shraiberg, Esq., Shraiberg, Ferrara & Landau, P.A., Counsel for Debtor, 2385 NW Executive Center Dr., Suite 300, Boca Raton, Florida 33431, Telephone (561) 443-0800, Facsimile No. (561) 998-0047;

(b)    D. Brett Marks, Esq., Akerman Senterfitt, Counsel for the Purchaser, 350 E. Las Olas Blvd., Suite 1600, Fort Lauderdale, Florida 33301, Telephone (954) 463-2700, Facsimile No. (954) 463-2224;

(c)    Lisa M. Schiller, Esq., Rice, Pugatch Robinson and Schiller, P.A., Counsel for Regions Bank, 101 N.E. 3rd Ave., Suite 1800, Fort Lauderdale, Florida 33301, Telephone (954) 462-8000, Facsimile No. (954) 462-4300;

(d)    Frank P. Delia, Kubicki Draper, Counsel for UPS Capital Business Credit, 1645 Palm Beach Lakes Boulevard, No. 1100, West Palm Beach, Florida, 33401,

4

Telephone (561) 616-4343, Facsimile No. (561) 640-0524; and

(e)   Glenn D. Moses, Esq., Genovese Joblove & Battista, P.A., Counsel for the Creditors' Committee, 100 Southeast Second Street, 44th Floor, Miami, Florida 33131, Telephone (305) 349-2300, Facsimile No. (305) 349-2310.

The bidder's Qualifying Bid Packet must include the bidder's address, telephone and facsimile numbers where the bidder may be contacted.

9.      The Debtor shall evaluate each Qualifying Bid Packet submitted in accordance with paragraph 8 and, in consultation with the Committee and Regions, may then identify a person, persons, entity or entities from among those who submitted a Qualifying Bid Packet and deem those person(s) "Qualified Bidders" as well as their offer to purchase the Assets. By participating in the Auction, each Qualified Bidder consents to its bid being designated as a back-up bid.

10.     The Debtor shall file and serve upon all interested parties entitled to receive notice, including the holders of qualified bids ("Qualified Bids"), fully executed copies of the Qualified Bids to be considered at the Auction no later than **January 13, 2011** (the "Qualified Bid Summary"). This requirement is waived in the event that there are no Qualified Bids. The Debtor shall notify all Qualified Bidders, no later than **5:00 p.m. E.S.T. on January 13, 2011**, that they may participate in the Auction.

11.     The Auction shall be conducted by Court and shall be a forum in which the Qualified Bidders may make competing bids to purchase the Assets, in minimum bid increments of $20,000.00 or increments as otherwise decided by the Court. The Auction shall conclude when the Court receives what is determined by the Debtor to be the highest and best offer to purchase the Assets (the **"Successful Bid"**). The Court may also identify an acceptable back-up bid.

12.     Except as otherwise stated herein, each Deposit shall be maintained in a non-

5

interest bearing account and subject to the jurisdiction of this Court. Within five (5) business days from the entry of an order approving the Sale, the Debtor shall return all Deposits to all Qualified Bidders except the Successful Bidder and the person determined by the Court to serve as the Back-Up Bidder (the "**Back-Up Bidder**"), whose Deposit shall be applied by the Debtor against the purchase price at the closing. In the event that the Successful Bidder closes the Sale, the Debtor shall return the Back-Up Bidder's Deposit within five (5) business days from the closing. In the event the Back-Up Bidder closes on the purchase of the Assets, its Deposit shall be applied by the Debtor against the purchase price.

13.    All Qualified Bidders shall be deemed to have consented to the core jurisdiction of this Court and to have waived any right to a jury trial in connection with any disputes relating to the Auction and/or the Sale. All asset purchase agreements shall be governed by and construed in accordance with the laws of the State of Florida. All Qualified Bidders shall be bound by their bids until conclusion of the Auction. If the Successful Bidder is unable or unwilling to close the Sale, the Successful Bidder shall forfeit its Deposit to the Debtor and the Debtor shall close the Sale with the Back-Up Bidder, without further notice or hearing, who shall then be obligated to close the Sale on the terms of the Back-Up Bid and the corresponding Bidder's membership interest purchase agreement no later than five (5) days thereafter. If the Back-Up Bidder, if any, is unable or unwilling to close the Sale in the time permitted, the Back-Up Bidder shall forfeit its Deposit to the Debtor.

14.    The Auction shall be conducted on **January 14, 2011, at 1:00 P.M. at the U.S. Bankruptcy Court, Flagler Waterview Property, 1515 North Flagler Drive, Room 801, Courtroom A, West Palm Beach, Florida 33401**. Immediately following the Auction, on **January 14, 2011**, the Court shall conduct a hearing to approve the sale arising out of the

6

Auction (the "Sale Hearing"). The deadline to object to the Sale is **January 13 2011, at 4:30 P.M.**

15.    In the event the Debtor fails to receive a Qualified Bid, the Debtor shall cancel the Auction seek the straight sale of the Assets to Camtech Acquisition, LLC.

16.    The closing shall occur within eleven (11) days after entry of an Order approving the Sale.

17.    The Debtor shall provide by e-mail; facsimile and/or U.S. Mail written notice of the Auction, the bidding procedures, and the Sale Hearing within one (1) business day from the entry of order approving the Sale Procedure Motion to: (a) those persons who in any way were in contact with the Debtor or any of its representatives regarding the sale of the Assets; (b) those persons who the Debtor has reason to believe may possess an interest in purchasing the Assets; (c) the U.S. Trustee; (d) counsel to the Purchaser: (e) counsel for Regions Bank; (f) counsel for the Creditors' Committee; (g) the Internal Revenue Service; (h) parties to executory contacts and leases with the Debtor; (i) all other parties who have filed a notice of appearance; (j) all other creditors; and (k) all potential purchasers of the Assets that made inquiries during the solicitation process.

18.    Parties in interest reserve the right to seek from this Court an extension of the deadlines and/or the Auction and Sale Hearing. The Debtor and the Purchaser reserve the right to contest any such request for extension.

19.    On or before January 30, 2011, the Debtors shall remit the sum of $18,155.12 to Genovese Joblove & Battista, P.A. on account of amounts due and owing pursuant to this Court's orders dated July 21, 2010 [D.E. numbers 97 and 98] and shall remit any unfunded retainers due to Debtor's current counsel, Shraiberg, Ferrara & Landau, P.A. under D.E. numbers

7

186 and 205.

###

Submitted by:

Bradley S. Shraiberg, Esq.
**SHRAIBERG, FERRARA & LANDAU, P.A.**
Attorney for the Debtor
2385 NW Executive Center Drive, #300
Boca Raton, Florida 33431
Telephone: 561-443-0800
Facsimile: 561-998-0047

Copies to:
Bradley S. Shraiberg, Esq.
[Attorney Bradley S. Shraiberg is directed to serve a conformed copy of this Order to all
interested parties immediately upon receipt and shall file a certificate of service with the Clerk.]

AS Draft 12/8/10



ASSET PURCHASE AGREEMENT

dated as of December 9, 2010

between

CAMTECH PRECISION MANUFACTURING, INC.

and

CAMTECH ACQUISITION, LLC

{O1594628;12}

# TABLE OF CONTENTS

ARTICLE I     DEFINITIONS AND RULES OF CONSTRUCTION ........................................... 1
1.1.    Definitions .................................................................................................... 1
1.2.    Rules of Construction ................................................................................... 8

ARTICLE II       PURCHASE AND SALE; ASSUMPTION OF CERTAIN LIABILITIES ....... 8
2.1.    Purchase and Sale of Assets ........................................................................ 8
2.2.    Excluded Assets ........................................................................................... 9
2.3.    Assumed Liabilities ................................................................................... 10
2.4.    Excluded Liabilities ................................................................................... 10
2.5.    Assignment and Assumption of the Assumed Seller Contracts .................. 10

ARTICLE III      PURCHASE PRICE ................................................................................... 11
3.1.    Purchase Price ............................................................................................ 11

ARTICLE IV       REPRESENTATIONS AND WARRANTIES OF SELLER ......................... 11
4.1.    Due Organization and Authority ................................................................ 11
4.2.    No Conflicts ............................................................................................... 12
4.3.    Compliance with Laws ............................................................................... 12
4.4.    Permits ....................................................................................................... 12
4.5.    Seller Contracts ......................................................................................... 12
4.6.    Real Property ............................................................................................. 12
4.7.    Intellectual Property ................................................................................... 13
4.8.    Litigation ................................................................................................... 14
4.9.    Title to Assets ............................................................................................ 14
4.10.   Labor and Employment .............................................................................. 14
4.11.   Affiliated Transactions ............................................................................... 14
4.12.   Absence of Certain Developments .............................................................. 14
4.13.   Accounts Receivable .................................................................................. 14

ARTICLE V       REPRESENTATIONS AND WARRANTIES OF PURCHASER .................. 15
5.1.    Due Organization and Authority ................................................................ 15
5.2.    Adequate Assurances Regarding Executory Contracts ................................ 15

ARTICLE VI      BANKRUPTCY COURT MATTERS ............................................................ 15
6.1.    Bankruptcy Court Matters .......................................................................... 15
6.2.    Bidding Procedures .................................................................................... 16
6.3.    Sale Approval Order ................................................................................... 16
6.4.    Appeal ........................................................................................................ 16
6.5.    Assumed Seller Contracts .......................................................................... 16
6.6.    Cure ........................................................................................................... 17
6.7.    Competing Bids .......................................................................................... 17

ARTICLE VII    COVENANTS ............................................................................... 18

| 7.1. | Operation of the Business ......................................................... 18 |
| 7.3. | Expenses .................................................................................... 19 |
| 7.4. | Public Announcements ............................................................. 19 |
| 7.5. | Access to Information ............................................................... 19 |
| 7.6. | Regulatory and Other Authorizations; Consents ..................... 20 |
| 7.7. | Further Action ........................................................................... 20 |
| 7.8. | Books and Records ................................................................... 21 |
| 7.9. | Tax Matters ............................................................................... 22 |
| 7.10. | Notification of Certain Matters ............................................... 22 |
| 7.11. | Required Notices....................................................................... 22 |
| 7.12. | Use of Name ............................................................................. 23 |
| 7.13. | Employment............................................................................... 23 |
| 7.14. | Assumed Liabilities .................................................................. 23 |

ARTICLE VIII    CONDITIONS PRECEDENT TO OBLIGATIONS OF PURCHASER ..... 23

| 8.1. | Representations and Warranties; Covenants............................. 23 |
| 8.2. | No Order ................................................................................... 24 |
| 8.3. | Bankruptcy Condition............................................................... 24 |
| 8.4. | Closing Documents ................................................................... 24 |
| 8.5. | No Material Adverse Effect ...................................................... 24 |
| 8.6. | Required Consents .................................................................... 24 |
| 8.7. | Cure Costs ................................................................................. 25 |
| 8.8. | Minimum Revenue.................................................................... 25 |
| 8.9. | Customer Retention .................................................................. 25 |
| 8.10. | Financing................................................................................... 25 |
| 8.11. | Negotiated M&E Liabilities and Assumed Real Estate Liabilities............................ 25 |

ARTICLE IX    CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLER .................. 25

| 9.1. | Representations and Warranties; Covenants............................. 25 |
| 9.2. | No Order ................................................................................... 25 |
| 9.3. | Bankruptcy Condition............................................................... 26 |
| 9.4. | Payment..................................................................................... 26 |
| 9.5. | Closing Documents ................................................................... 26 |

ARTICLE X    CLOSING ................................................................................. 26

| 10.1. | Closing ...................................................................................... 26 |
| 10.2. | Deliveries by the Seller............................................................ 26 |
| 10.3. | Deliveries by Purchaser ........................................................... 27 |
| 10.4. | Allocation of Proceeds ............................................................. 27 |

ARTICLE XI    TERMINATION; TERMINATION PAYMENT............................. 28

| 11.1. | Termination Prior to Closing ................................................... 28 |
| 11.2. | Effect of Termination; Remedies.............................................. 29 |
| 11.3. | Exclusive Remedy .................................................................... 30 |

11.4.    Survival After Termination ................................................................................. 30

ARTICLE XII    MISCELLANEOUS ................................................................................. 30

12.1.    Amendment ................................................................................................. 30
12.2.    Notices ...................................................................................................... 30
12.3.    Waivers ..................................................................................................... 31
12.4.    Counterparts and Execution ......................................................................... 31
12.5.    Headings .................................................................................................... 32
12.6.    Applicable Law and Jurisdiction .................................................................. 32
12.7.    Waiver of Jury Trial .................................................................................... 32
12.8.    Binding Nature; Assignment ........................................................................ 32
12.9.    No Third Party Beneficiaries ....................................................................... 32
12.10.   Termination of Representations, Warranties and Covenants ............................. 33
12.11.   Entire Understanding ................................................................................... 33
12.12.   Partial Invalidity ......................................................................................... 33
12.13.   Time is of the Essence ................................................................................. 33

## LIST OF EXHIBITS AND SCHEDULES

Exhibits

| | |
|---|---|
| Exhibit A | Form of Assignment and Assumption Agreement |
| Exhibit B | Form of Assignments of Intangible Property |
| Exhibit C | Form of Bill of Sale |
| Exhibit D | Form of Bidding Procedures Order |
| Exhibit E | Form of Sale Approval Order |

Schedules

| | |
|---|---|
| Schedule 2.1(a) | Assumed Seller Contracts |
| Schedule 2.1(b) | Transferred Real Property |
| Schedule 2.1(c) | Transferred IP |
| Schedule 2.1(e) | Transferred Permits |
| Schedule 2.2(b) | Excluded Assets |
| Schedule 2.2(c) | Excluded Contracts |
| Schedule 4.1 | Jurisdiction of Organization |
| Schedule 4.3 | Compliance with Laws |
| Schedule 4.4 | Permits |
| Schedule 4.5 | Seller Contracts |
| Schedule 4.6(a) | Owned Real Property |
| Schedule 4.6(b) | Leased Real Property |
| Schedule 4.6(c) | Environmental |
| Schedule 4.7(a)(i) | Intellectual Property Rights |
| Schedule 4.7(a)(ii) | Licensed Intellectual Property |
| Schedule 4.11 | Affiliate Transactions |
| Schedule 4.12 | Absence of Certain Developments |
| Schedule 4.14 | Inventory |
| Schedule 8.6 | Required Consents |
| Schedule 8.8 | Minimum Revenue Target |
| Schedule 10.2(e) | Employment Agreements |
| Schedule 10.2(h) | Estoppel Certificates |

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (the "Agreement") is dated December 9, 2010, between Camtech Acquisition, LLC, a Delaware limited liability company (the "Purchaser"), and CAMtech Precision Manufacturing, Inc., a New York corporation ("CAMtech" or the "Seller").

WHEREAS, the Seller is engaged in the business of manufacturing precision parts for the aerospace, defense and other industries (the "Business");

WHEREAS, on May 10, 2010 (the "Filing Date"), Seller filed a voluntary petition for relief (the "Bankruptcy Case") under Chapter 11 of Title 11 of the United States Bankruptcy Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Florida (the "Bankruptcy Court");

WHEREAS, the Purchaser desires to purchase certain assets of the Seller and to assume certain liabilities of the Seller, and the Seller desires to sell such assets to the Purchaser and to assign such liabilities to the Purchaser, all on the terms and conditions set forth in this Agreement and in accordance with sections 105, 363, 365 and other applicable provisions of the Bankruptcy Code;

WHEREAS, the Transferred Assets will be sold free and clear of all Encumbrances pursuant to an order of the Bankruptcy Court approving such sale under section 363 of the Bankruptcy Code, and such sale will include the assumption by the Seller and concurrent assignment to the Purchaser of the Assumed Seller Contracts under section 365 of the Bankruptcy Code and the terms and conditions of this Agreement; and

WHEREAS, the Seller desires to sell the Transferred Assets free and clear of all Encumbrances and to assign the Assumed Seller Contracts and Assumed Liabilities.

NOW, THEREFORE, in consideration of the foregoing and the representations, warranties and covenants herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS AND RULES OF CONSTRUCTION

1.1.    Definitions.    Unless otherwise defined herein, capitalized terms used herein shall have the meanings set forth below:

"Aboveground Storage Tank" shall have the meaning ascribed to such term in Section 6901 et seq., as amended, of RCRA, or any applicable Law governing Aboveground Storage Tanks.

"Accounts Receivable" means any and all accounts receivable, notes receivable, checks, similar instruments and other amounts owed to Seller for services rendered in the operation of the Business, together with all security or other collateral therefor and any interest for unpaid financing charges accrued thereon.

"Affiliate" means, with respect to any specified Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with such specified Person.

"Assignment and Assumption Agreement" means the Assignment and Assumption Agreement substantially in the form of Exhibit A hereto to be executed by the Purchaser and the Seller on the Closing Date.

"Assignments of Intangible Property" means the Assignments of Intangible Property substantially in the form of Exhibit B hereto to be executed by the Seller on the Closing Date.

"Assumed Real Estate Liabilities" means such Liabilities under the Assumed Real Estate Loans as Purchaser and the other parties thereto shall mutually agree upon between the date hereof and the Closing Date.

"Assumed Real Estate Loans" means (i) loan in the approximate amount as of December 1, 2010 of $1,627,871 made by UPS Capital Business Credit against the real property located in Texas ("Texas Facility"), (ii) loan in the approximate amount as of December 2, 2010 of $344,765 made by Enterprise Bank of against the Florida Facility ("Florida Facility"), and (iii) loan in the approximate amount as of December 2, 2010 of $705,262 made by UPS Capital Business Credit against the Florida Facility.

"Assumed Seller Contracts" has the meaning set forth in Section 2.1(a).

"Bill of Sale" means Bills of Sale substantially in the form of Exhibit C hereto to be executed by the Seller on the Closing Date.

"Borrowing Base" means, on the date of determination, an amount equal to the sum of (i) eighty percent (80%) of valid and collectible Accounts Receivable plus (ii) fifty percent (50%) of the cost basis of the Inventory.

"Business Day" means any day that is not a Saturday, Sunday or other day on which banks located in New York are authorized or obligated to close.

"Claim" means a suit, claim (including any "claim" as defined in Section 101(5) of the Bankruptcy Code), action, proceeding, inquiry, investigation, litigation, demand, charge, complaint, grievance, arbitration, indictment, information, or grand jury subpoena.

"Disclosure Schedules" means Disclosure Schedules to this Agreement.

"Encumbrances" means all security interests, mortgages, pledges, liens, encumbrances, charges, Claims, conditional sales agreements, rights of first refusal or options.

"Environmental Laws" means all applicable past (which have current effect), present or future federal, state, regional, county and local Laws, by-laws, rules, regulations, codes and ordinances, or any judicial or administrative interpretations thereof, and the requirements of any Governmental Body or authority having or claiming jurisdiction with respect thereto, applicable to (i) the regulation or protection of the environment (including concerning any and all environmental media), (ii) the health and safety of persons and property, (iii) the conservation, management, preservation or use of natural resources, species, habitat or wildlife, (iv) the management, manufacture, possession, handling, presence, use, generation, transportation, treatment, storage, release, threatened release, investigation, assessment, abatement, corrective action, removal, or remediation of, or exposure to, Hazardous Material, (v) the protection or use of surface water, groundwater, or other water bodies or other water features, and (v) all other environmental matters and shall include, but not be limited to, all orders, decrees, judgments and rulings imposed through any public or private enforcement proceedings, relating to Hazardous Materials or the existence, use, discharge, release, containment, transportation, generation, storage, management or disposal thereof, or otherwise regulating or providing for the protection of the environment applicable to the Real Property and relating to Hazardous Materials, or to the existence, use, discharge, release or disposal thereof. Environmental Laws presently include, but are not limited to, the following statutes and the regulations promulgated thereto: CERCLA (42 U.S.C. §9601 et seq.), the Hazardous Materials Transportation Act (49 U.S.C. §1801 et seq.), the Public Health Service Act (42 U.S.C. §300(f) et seq.), the Pollution Prevention Act (42 U.S.C. §13101 et seq.), the Federal Insecticide, Fungicide and Rodenticide Act (7 U.S.C. §136 et seq.), the Resource Conservation and Recovery Act (42 U.S.C. §6901 et seq.), the Federal Clean Water Act (33 U.S.C. §1251 et seq.), the Federal Clean Air Act (42 U.S.C. §7401 et seq.), and any other federal, state, regional, county, municipal and other local Laws, regulations and ordinances and any verified decisions of a state or federal court insofar as they are equivalent or similar to the federal and state Laws recited above or purported to regulate Hazardous Substances each as the same may be amended from time to time.

"Excluded Records" means originals of all (i) stock records books and stock certificates, (ii) all tax and financial accounting records of the Seller, and (iii) all minute books of the Seller; provided, however, that Purchaser shall be entitled to copies thereof.

"Expense Reimbursement" means the actual fees and costs (including, without limitation, attorneys' fees and expenses) expended by Purchaser while performing its due diligence, and negotiating, tracking and prosecuting/defending the sale of the Transferred Assets up to a maximum amount equal to the greater of (i) $350,000 or (ii) five percent of the total consideration, including the assumption or discharge of liabilities, in connection with any Post-Chapter 7 Sale or any sale to a Competing Bid.

"GAAP" means United States generally accepted accounting principles consistently applied.

"Governmental Body" means a domestic or foreign national, federal, state, provincial, or local governmental, regulatory or administrative authority, department, agency, commission, court, tribunal, arbitral body or self-regulated entity.

"Hazardous Materials" shall be construed broadly to mean and include asbestos, flammable materials, explosives, radioactive or nuclear substances, polychlorinated biphenyls, other carcinogens, oil and other petroleum products, radon gas, urea formaldehyde, mold, chemicals, gases, solvents, pollutants or contaminants that could be a detriment or pose a danger to the environment or to the health or safety of any person, and any other hazardous or toxic materials, wastes and substances which are defined, determined or identified as such in any past, present or future federal, state or local Laws, by-laws, rules, regulations, codes or ordinances or any judicial or administrative interpretation thereof.

"Insider" means insider (including any insider as defined in Section 101(31) of the Bankruptcy Code), any executive officer, director, governing body member, equity holder, partner in a partnership or Affiliate, as applicable, of Seller or any predecessor or Affiliate of Seller or any individual related by marriage or adoption to any such individual.

"Intellectual Property Rights" means all of the following in any jurisdiction throughout the world: (i) all inventions (whether patentable or unpatentable and whether or not reduced to practice), all improvements thereto, and all patents, patent applications, and patent disclosures, together with all reissuances, continuations, continuations-in-part, revisions, divisionals, extensions, and reexaminations thereof, (ii) all Marks, (iii) all copyrights and other works of authorship, and all applications, registrations, and renewals in connection therewith, (iv) all trade secrets and business information (including ideas, research and development, know-how, formulas, compositions, processes, techniques, methods, technical data, designs, drawings, specifications, customer and supplier lists, pricing and cost information, and business and marketing plans and proposals), (v) all computer software (including source code, executable code, data, databases, and related documentation), (vi) all other proprietary and intellectual property rights, and (vii) all copies and tangible embodiments of any of the foregoing (in whatever form or medium).

"IRS" means the United States Internal Revenue Service.

"Law" means any federal, state or local statute, law, rule, regulation, order or other requirement of any Governmental Body.

"Liabilities" means any direct or indirect, primary or secondary, liability, indebtedness, obligation, penalty, cost or expense (including costs of investigation, collection and defense), Claim, deficiency, guaranty or endorsement of or by any Person (other than endorsements of notes, bills, checks and drafts presented for collection or

deposit in the ordinary course of business) of any type, whether accrued, absolute or contingent, liquidated or unliquidated, choate or inchoate, matured or unmatured, or otherwise. Without limiting the foregoing, the term "Liabilities" includes and refers to all liabilities and obligations for or with respect to Taxes, including liabilities for Taxes of any Person under Treasury Regulation Section 1.1502-6 (or any similar provision of any applicable Law), as a transferee or successor, by contract, or otherwise.

"Marks" means all trademarks, service marks, trade dress, logos, slogans, designs, trade names, corporate names, Internet domain names and rights in telephone numbers, together with all translations, adaptations, derivations, and combinations thereof, all applications, registrations, and renewals in connection therewith, and including all goodwill associated with any of the foregoing.

"Material Adverse Effect" means a material adverse effect on the business, financial condition or results of operations of the Business, taken as a whole, the Transferred Assets, taken as a whole, or the Assumed Liabilities, taken as a whole, except any such effect resulting from (i) general changes or developments in the industry in which the Business operates which do not impact the Business disproportionately, (ii) changes in global or national political conditions (including the outbreak of war or acts of terrorism) or in general economic conditions or in national or global financial markets, in each instance which do not impact the Business disproportionately, (iii) changes in any applicable Law or applicable accounting regulations or principles or interpretations thereof, or (iv) any action taken by the Seller which is required in connection with this Agreement.

"Negotiated M&E Liabilities" means such Liabilities with respect to Industrial Equipment Capital, Peoples Capital and Leasing, Plains Capital Leasing, PNC Equipment Finance, Siemens Financial Services and Wells Fargo Equipment Finance as Purchaser and the other parties thereto shall mutually agree upon between the date hereof and the Closing Date.

"Permitted Encumbrance" means: (i) liens for Taxes and assessments not yet payable; (ii) inchoate mechanics' liens for work in progress arising in the ordinary course and not past due and payable or the payment of which is being contested in good faith by appropriate proceedings; (iii) materialmen's, mechanics', carriers', workmen's and repairmen's liens arising in the ordinary course and not past due and payable or the payment of which is being contested in good faith by appropriate proceedings; (iv) liens that will be released at or prior to the Closing; and (v) (A) easements, rights-of-way, servitudes, permits, licenses, surface leases, ground leases to utilities, municipal agreements, railway siding agreements and other rights, all as reflected in the official records of the jurisdictions where any Transferred Real Property is located, (B) conditions, covenants or other restrictions reflected in the official records of the jurisdictions where any Transferred Real Property is located, and (C) easements for streets, alleys, highways, telephone lines, gas pipelines, power lines, railways and other easements and rights-of-way on, over or in respect of any Transferred Real Property, all as reflected in the official records of the jurisdictions where any Transferred Real Property is located; in each case with respect to clauses (i) through (v) above,

individually or in the aggregate, that do not or would not reasonably be expected to materially and adversely affect the current use or value of the property subject thereto or the operations of the Seller as it is currently conducted.

"Person" means any individual, corporation, partnership, limited liability company, limited liability partnership, firm, joint venture, association, joint-stock company, trust, unincorporated organization, Governmental Body or other entity.

"Real Property" means the Owned Real Property, Leased Real Property and Transferred Real Property, together with all strips, gores, easements, privileges, rights-of-way, riparian and other water rights, rights to lands underlying any adjacent streets or roads, air and mineral rights, and all other tenements, hereditaments and appurtenances, if any, pertaining to or accruing to the benefit of any of the Owned Real Property, Leased Real Property and/or Transferred Real Property.

"Representative" means, with respect to a particular Person, any director, officer, manager, partner, shareholder, member, employee, agent, consultant, advisor, lender or prospective lender, co-investor or potential co-investor, or other representative of such Person, including legal counsel, accountants, and financial advisors.

"Seller Contract" means any written or oral agreement, arrangement, understanding, purchase order, lease or instrument or other contractual or similar arrangement or commitment, to which Seller is a party.

"Seller's Knowledge" means the knowledge of all directors and officers of Seller after reasonable investigation.

"Tax" or "Taxes" means all taxes, charges, fees, imposts, levies or other assessments, including, without limitations, all net income, franchise, profits, gross receipts, capital, sales, use, ad valorem, value added, transfer, transfer gains, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation, real or personal property, and estimated taxes, customs duties, fees, assessments and charges of any kind whatsoever, together with any interest and any penalties, fines, additions to tax or additional amounts thereon, imposed by any taxing authority (federal, state, local or foreign) and shall include any transferee liability in respect of Taxes.

"Tax Returns" means all returns, declarations, reports, forms, estimates, information returns and statements required to be filed in respect of any Taxes or to be supplied to a taxing authority in connection with any Taxes.

"Third Party" means any Person other than the Seller, the Purchaser or any of their respective Affiliates.

"Underground Storage Tank" shall have the meaning ascribed to such term in Section 6901 et seq., as amended, of RCRA, or any applicable Law governing Underground Storage Tanks.

The following capitalized terms are defined in the following Sections of this Agreement:

| Definition | Location |
| --- | --- |
| Agreement | Preamble |
| Assumed Seller Contracts | 2.1(a) |
| Assumed Liabilities | 2.3 |
| Bankruptcy Case | Recitals |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Bidding Procedures | 6.1 |
| Bidding Procedures Order | 6.1 |
| Books and Records | 2.1(f) |
| Business | Recitals |
| Cash Consideration | 3.1(b) |
| Closing | 10.1 |
| Closing Date | 10.1 |
| Competing Bid | 6.7 |
| Cure Costs | 2.1(a) |
| Excluded Assets | 2.2 |
| Excluded Liabilities | 2.4 |
| Filing Date | Recitals |
| Inventory | 2.1(k) |
| Leased Real Property | 4.6(b) |
| Leases | 4.6(b) |
| Owned Real Property | 4.6(a) |
| Permits | 4.4 |
| Post-Chapter 7 Sale | 11.2(c) |
| Purchase Price | 3.1 |
| Purchaser | Preamble |
| Purchaser's Certificate | 9.1 |
| Rehired Employee | 7.12 |
| Requested Party | 7.7(b) |
| Requesting Party | 7.7(b) |
| Sale Approval Order | 6.1 |
| Seller | Preamble |
| Seller's Certificate | 8.1 |
| Seller Intellecutal Property Rights | 4.7(a) |
| Systems | 4.7(b) |
| Termination Date | 11.1(b) |
| Transferred Assets | 2.1 |
| Transferred IP | 2.1(c) |
| Transferred Permits | 2.1(e) |
| Transferred Real Property | 2.1(b) |

1.2.    Rules of Construction.  The parties hereto have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the Parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement.  Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

(a)    Any reference in this Agreement to "dollars" or "$" shall mean U.S. dollars.

(b)    All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(c)    Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

(d)    The provision of a Table of Contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement.  All references in this Agreement to any "Section" are to the corresponding Section of this Agreement unless otherwise specified.

(e)    The words such as "herein," "hereinafter," "hereof" and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

(f)    Unless the context otherwise clearly indicates, in this Agreement "includes" and "including" are not limiting.

ARTICLE II
PURCHASE AND SALE; ASSUMPTION OF CERTAIN LIABILITIES

2.1.    Purchase and Sale of Assets.  Subject to the terms and conditions set forth in this Agreement, at the Closing, the Seller shall sell, assign, transfer, convey and deliver (or cause to be sold, assigned, transferred, conveyed and delivered) to the Purchaser, and the Purchaser shall purchase, assume and accept from the Seller, free and clear of all Encumbrances other than Permitted Encumbrances, all of the Seller's right, title and interest in and to all of the Seller's properties, assets and rights, other than the Excluded Assets (such rights, title and interests in and to such assets, properties and rights being collectively referred to herein as the "Transferred Assets"), in accordance with, and with all of the protections afforded by, sections 363 and 365 of the Bankruptcy Code:

(a)    subject to Section 6.5, all Seller Contracts, including, but not limited to, the Assumed Real Estate Loans and the Seller Contracts listed on or described in Schedule 2.1(a) (the "Assumed Seller Contracts"); provided, however, the Purchaser

acknowledges that it shall be obligated to pay pre- or post-petition date costs and expenses when they become due and payable as provided herein and as required by the Sale Approval Order to be paid to cure any and all monetary defaults as of the Closing under all Assumed Seller Contracts for which necessary consents and/or Bankruptcy Court approval to transfer have been received (the "Cure Costs") in an amount not to exceed $225,000 in the aggregate as consideration for the purchase of the Transferred Assets;

(b)    all real property, leaseholds and other interests in real property, including, but not limited to, that listed on or described in Schedule 2.1(b), together in each case with the Seller's right, title and interest in and to all structures, facilities or improvements located thereon and all easements, licenses, rights and appurtenances relating to the foregoing (the "Transferred Real Property");

(c)    all Intellectual Property Rights of Seller relating to the Business, including, but not limited to, that listed on or described in Schedule 2.1(c) (the "Transferred IP");

(d)    all furniture, furnishings, machinery, equipment and supplies and similar tangible personal property used by the Seller in the Business;

(e)    all Permits used by Seller in the Business, including, but not limited to, that listed on Schedule 2.1(e), to the extent assignable (the "Transferred Permits");

(f)    all books of account, general, financial, accounting and personnel records, files, invoices, customers' and suppliers' lists, other distribution lists, billing records, sales and promotional literature, manuals and customer and supplier correspondence owned by the Seller relating to the Business (the "Books and Records");

(g)    all of Seller's cash, bank deposits and cash equivalents;

(h)    all Accounts Receivable;

(i)    all of Seller's bank accounts;

(j)    all Security Deposits;

(k)    all instruments and inventory, finished goods, raw materials, work in progress, packaging, supplies, parts and other inventories (the "Inventory"); and

(l)    all investments, equity interests and other security owned or held by the Seller.

2.2.    Excluded Assets.    Notwithstanding anything to the contrary in this Agreement, the following assets of the Seller, shall be retained by the Seller and are not being sold or assigned to the Purchaser hereunder (all of the following are referred to collectively as the "Excluded Assets"):

(a)    all of the Seller's bank accounts with any negative cash balances;

(b)    all of the assets of the Seller listed or described in Schedule 2.2(b);

(c)    all Seller Contracts listed or described in Schedule 2.2(c);

(d)    all rights of the Seller under this Agreement and any other Seller Contract entered into in connection with the transactions contemplated hereby;

(e)    all Excluded Records; and

(f)    all of the rights and Claims of the Seller to avoidance actions available to the Seller under Chapter 5 of the Bankruptcy Code, of whatever kind or nature, including avoidance actions under sections 544, 545, 547, 548, 549 and 553 of the Bankruptcy Code, and any related claims and actions arising under such sections by operation of law or otherwise, including any and all proceeds of the foregoing (other than Claims with respect to counterparties to Assumed Seller Contracts).

2.3.    Assumed Liabilities.  At the Closing, the Purchaser shall assume and in due course pay, discharge, perform or otherwise fully satisfy only the following Liabilities of the Seller arising out of, relating to or otherwise in respect of the Business or the Transferred Assets (the "Assumed Liabilities"):

(a)    the Negotiated M&E Liabilities and the Assumed Real Estate Liabilities;

(b)    all Liabilities of the Seller under the Assumed Seller Contracts and the Transferred Permits, solely to the extent arising after, and in respect of periods following, the Closing Date; and

(c)    all Cure Costs as provided herein.

2.4.    Excluded Liabilities.  Notwithstanding anything to the contrary contained in this Agreement, the parties expressly acknowledge and agree that the Purchaser shall not assume or be liable or responsible for any Liability of the Seller (including, without limitation, Taxes), other than the Assumed Liabilities, except as required by applicable Law (such Liabilities being collectively referred to herein as the "Excluded Liabilities").  Nothing contained in this Agreement shall require the Purchaser to pay or discharge any Assumed Liabilities (i) prior to such Assumed Liabilities becoming due and payable in accordance with the underlying terms of any Seller Contracts giving rise to or governing such Assumed Liabilities, (ii) so long as the Purchaser shall in good faith contest the amount or the validity thereof, or (iii) so long as the amount or validity of such Liability is in dispute.  Nothing herein shall limit any Claims the Purchaser may have against any party other than the Seller. The transactions contemplated by this Agreement shall in no way expand the rights or remedies of any third party against the Purchaser or the Seller as compared to the rights and remedies which such third party would have had against the Seller absent the Bankruptcy Case had the Purchaser not assumed such Assumed Liabilities.

2.5.    Assignment and Assumption of the Assumed Seller Contracts.  Without limiting Sections 2.1(a) and 2.3(a):

(a)    as of the Closing, the Seller shall assume pursuant to Section 365(a) of the Bankruptcy Code and concurrently assign to the Purchaser pursuant to Sections 363(b), (f) and (m) and Section 365(f) of the Bankruptcy Code each of the Assumed Seller Contracts that are assumed pursuant to the Sale Approval Order; and

(b)    as of the Closing the Purchaser shall assume and thereafter in due course pay, discharge, perform and fully satisfy, all further obligations under such Assumed Seller Contracts pursuant to section 365 of the Bankruptcy Code from and after the Closing, and shall pay the Cure Costs as provided herein so that all applicable Assumed Seller Contracts may be assigned to the Purchaser pursuant to section 365 of the Bankruptcy Code, in each case, in a manner consistent with the Sale Approval Order.

## ARTICLE III
## PURCHASE PRICE

3.1.    Purchase Price.  The aggregate consideration (collectively, the "Purchase Price") to be paid to Seller for the sale and purchase of the Transferred Assets at the Closing shall be:

(a)    the assumption of, and the undertaking to discharge, the Assumed Liabilities, including, without limitation, the Negotiated M&E Liabilities and the Assumed Real Estate Liabilities, by the Purchaser; and

(b)    a cash payment (the "Cash Consideration") to Seller in an amount equal to (i) $1,000,000.00, less (ii) the aggregate amount of the Cure Costs not to exceed $225,000 in the aggregate.

The Purchase Price shall be allocated in accordance with Section 10.4.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF SELLER

Except listed in the Disclosure Schedules to this Agreement delivered by the Seller, which shall specify the Section to which each exception or disclosure relates and shall qualify only the corresponding section or subsection in this Article IV, the Seller represents and warrants to the Purchaser that the statements contained in this Article IV are true and correct as of the date hereof.

4.1.    Due Organization and Authority.  Seller is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization specified in Schedule 4.1 and has all necessary corporate (or equivalent) power and authority to own, lease and operate its assets (including the Transferred Assets) and to carry on the Business as it is now being conducted.  Subject to the entry of the Sale Approval Order, (a) the Seller has all requisite corporate (or equivalent) power and authority to enter into this Agreement, carry out its obligations hereunder and consummate the transactions contemplated hereby and (b) the execution and delivery by the Seller of this Agreement, the performance by the Seller of its respective obligations hereunder and the consummation by the Seller of the transactions contemplated hereby have been duly authorized by all requisite corporate (or equivalent) action

on the part of the Seller. This Agreement has been duly executed and delivered by the Seller, and, upon entry of the Sale Approval Order (assuming the due authorization, execution and delivery hereof by the Purchaser and satisfaction of all conditions to the Closing), this Agreement will constitute the legal, valid and binding obligation of the Seller, enforceable against the Seller in accordance with its terms, except to the extent enforceability may be limited by bankruptcy, insolvency, moratorium or other similar laws affecting creditors rights generally or by general principles of equity (regardless of whether enforcement is considered in a proceeding in equity or at law). Seller has previously made available to the Purchaser true, accurate and complete copies of the articles of incorporation and bylaws, or comparable instruments, as in effect on the date hereof, of Seller. Seller does not own, directly or indirectly, any capital stock of, or equity ownership or voting interest in, any other Person.

4.2.    No Conflicts.    Subject to the entry of the Sale Approval Order, the execution and delivery by the Seller of this Agreement, the consummation of the transactions contemplated hereby, and the performance by the Seller of this Agreement in accordance with its terms will not violate, result in any breach of, constitute a default (or an event that, with notice or lapse of time or both, would become a default) under, give any Third Party the right to modify, terminate or accelerate any obligation under, or require any consent, authorization, approval or any other action of any Person in connection with any Seller Contract or Permit.

4.3.    Compliance with Laws. Except as set for on Schedule 4.3, the Business is being conducted in all material respects in compliance with all Laws applicable to the Seller and during the prior two years no written notice has been received by the Seller alleging the failure to comply in any material respects with any applicable Law.

4.4.    Permits.    Schedule 4.4 sets forth a list of all of the Seller's licenses, franchises, permits, variances, exemptions, orders, approvals and authorizations of Governmental Bodies, including any applications therefor, that are used by Seller or have been issued to Seller for use in the conduct of the Business as currently conducted (collectively, the "Permits").

4.5.    Seller Contracts.    Except as set forth on Schedule 4.5 attached hereto, Seller is not a party to or bound by any Seller Contract. Each Seller Contract is valid and binding upon Seller and the counterparties thereto and is in full force and effect. Neither Seller nor any other party is in material breach of, or material default under, any Seller Contract (except to the extent that any such breach or default is cured, or the requirement for cure is waived, in connection with the Sale Approval Order). Seller has provided the Purchaser with a true and correct copy of all Assumed Seller Contracts disclosed on Schedule 4.5 attached hereto together with all amendments, waivers or other changes thereto. Schedule 4.5 contains a true and accurate description of all material terms of all oral Seller Contracts referenced thereon.

4.6.    Real Property.

(a)    Schedule 4.6(a) lists the street address of each parcel of real property owned by the Seller and used in connection with the Business (together with all buildings, fixtures, structures and improvements situated thereon and all easements, rights-of-way and other rights and privileges appurtenant thereto, collectively, the "Owned Real Property"). Seller has delivered to Purchaser copies of all title insurance policies, surveys,

leases, subleases, rent rolls, environmental assessments and reports, and property reports in the possession of Seller with respect to such Owned Real Property. With respect to each parcel of Owned Real Property: (i) Seller has good and marketable fee simple title, free and clear of all Encumbrances, except Permitted Encumbrances, and is the only party in possession thereof; (ii) there are no outstanding options, rights of first offer or rights of first refusal to purchase such Owned Real Property or any portion thereof or interest therein, (iii) to the Seller's Knowledge, the operation and use of the buildings and other improvements constituting the Owned Real Property does not violate, in any material respect, any zoning, subdivision, building or other similar Law with respect to the Owned Real Property; and (iv) there are no material defects in the building, improvements, structures or fixtures located on or at the Owned Real Property.

(b)     Schedule 4.6(b) lists the street address of each parcel of real property leased, subleased or occupied by the Seller and used in connection with the Business (the "Leased Real Property") and a description of each lease or sublease therefor, including the parties and all amendments, modifications and extensions thereto (the "Leases"). True, correct and complete copies of the Leases have been delivered by Seller to the Purchaser.

(c)     Except as set forth on Schedule 4.6(c), Seller is and has at all times been in full compliance with all Environmental Laws, including, without limitation, all applicable writs, orders, judgments, injunctions, governmental communications, decrees, informational requests or demands issued pursuant to, or arising under, any Environmental Laws. There are no (and there is no basis for any) (i) non-compliance orders, warning letters, claims, or notices of violation issued to or, to Sellers' Knowledge, threatened against or affecting; (ii) suits, actions, or administrative, regulatory, or judicial investigations or proceedings commenced or, to Sellers' Knowledge, threatened against or affecting; and/or (iii) judgments, penalties, or fines imposed or, to Sellers' Knowledge, threatened against or affecting the Business or the Real Property by any Governmental Body or third party relating to or arising out of any Environmental Laws. No Hazardous Materials have been or are currently generated or managed at, stored or utilized on, or transported or discharged from the Real Property, whether or not in reportable quantities. Seller does not use, nor has it at any time used, any Aboveground Storage Tanks or Underground Storage Tanks on the Real Property or in connection with the Business and there are not now nor have there ever been any Aboveground or Underground Storage Tanks on the Real Property or any other real property owned, leased or used at any time in connection with the Business during the time that such other property has been owned, leased or used by Seller.

4.7.     Intellectual Property.

(a)     Schedule 4.7(a)(i) contains a complete and accurate list of all of the following that are owned or used by Seller: (i) patented or registered Intellectual Property Rights, (ii) pending patent applications or other applications for registrations of other Intellectual Property Rights, (iii) all computer software, and (iv) trade or corporate names, Internet domain names, and unregistered Marks. Seller owns and possesses, or has the right to use pursuant to a valid and enforceable written license set forth on Schedule 4.7(a)(ii), all Intellectual Property Rights necessary for or used in the operation of the Business as currently conducted (together with the Intellectual Property Rights owned by Seller, collectively, the "Seller Intellectual Property Rights").

(b)    The computer systems, including the software, hardware, networks, interfaces and related systems used in the conduct of the Business (collectively, "Systems") are sufficient for the Business as currently conducted by Seller and such Systems are in compliance with applicable Laws. All Systems used in the Business are owned and operated by and are under the control of Seller, and are not wholly or partly dependent on any facilities which are not under the ownership, operation or control of Seller.

4.8.    <u>Litigation</u>. Except for the Bankruptcy Case and any and all actions, adversary proceedings and litigation arising therefrom or related thereto, there are no Claims pending or, to the Seller's Knowledge, threatened against the Seller with respect to the Business before any Governmental Body.

4.9.    <u>Title to Assets</u>. Upon the entry of the Sale Approval Order, at the Closing, the Seller currently has and shall have at the Closing good and marketable title to, or a valid and enforceable right by Seller Contract to use, the Transferred Assets, which shall be transferred to the Purchaser free and clear of all Encumbrances, other than Permitted Encumbrances. The Transferred Assets, taken as a whole, are in good operating condition and repair (ordinary wear and tear excepted) and are fit for use in the ordinary course of business. The Transferred Assets will be sufficient to enable the Purchaser to continue to transact business on substantially the same basis as the Seller conducted business prior to the Closing.

4.10.    <u>Labor and Employment</u>. Seller is not a party to or bound by any labor or collective bargaining agreement, no labor organization or group of employees has made any demand for recognition or certification and, to the Seller's Knowledge, no labor union is seeking to organize any employees of the Seller.

4.11.    <u>Affiliated Transactions</u>. Except as set forth on <u>Schedule 4.11</u>, no Insider has any interest in the Transferred Assets or is a party to any Seller Contract used in or related to the Business. Except as set forth on <u>Schedule 4.11</u>, no Insider has (i) any economic interest in any Person which has engaged or does currently engage in competition with Seller or (ii) any economic interest in any Person that purchases from or sells or furnishes to Seller any services or products.

4.12.    <u>Absence of Certain Developments</u>. Except as set forth on <u>Schedule 4.12</u> attached hereto, and except as expressly contemplated by this Agreement, since November 30, 2010:

(a)    Seller has not sold, leased, assigned or transferred (including, without limitation, transfers to stockholders, holders of ownership interests or any Insider) a portion of its tangible assets, except for sales of inventory which, prior to the commencement of the Bankruptcy Case, were conducted in the ordinary course of business, or cancelled without fair consideration any material debts or claims owing to or held by it; and

(b)    Seller has not entered into, amended or terminated any Seller Contract.

4.13.    <u>Accounts Receivable and Inventory</u>.

(a)    Seller has at least $450,000 of Accounts Receivable, which Accounts Receivable (i) represent valid obligations arising from bona fide sales actually made or services actually performed in the ordinary course of business, (ii) are not subject to valid counterclaims or setoffs, and (iii) are current and collectible in accordance with their terms at their recorded amounts;

(b)    Seller has Inventory with a cost basis of at least $875,000 determined in accordance with GAAP, which Inventory is of a quality and quantity usable and salable in the ordinary course of business consistent with past practice. All Inventory is owned by Seller free and clear of all Encumbrances, except for Permitted Encumbrances, and no Inventory is held on a consignment basis. A complete list of all Inventory is included in Schedule 4.13(b).

(c)    As of the Closing Date, the Borrowing Base shall be at least $850,000.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

The Purchaser represents and warrants to Seller on the date hereof as follows:

5.1.    Due Organization and Authority. The Purchaser is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware and has all necessary power and authority to own, lease and operate its properties and to carry on its business as now being conducted. The Purchaser has all requisite power and authority to enter into this Agreement, carry out its obligations hereunder and consummate the transactions contemplated hereby. The execution and delivery by the Purchaser of this Agreement, the performance by the Purchaser of its obligations hereunder and the consummation by the Purchaser of the transactions contemplated hereby have been duly authorized by all requisite action on the part of the Purchaser. This Agreement has been duly executed and delivered by the Purchaser, and, assuming the due authorization, execution and delivery hereof by the Seller, this Agreement constitutes the legal, valid and binding obligation of the Purchaser, enforceable against the Purchaser in accordance with its terms, except to the extent enforceability may be limited by bankruptcy, insolvency, moratorium or other similar laws affecting creditors rights generally or by general principles of equity (regardless of whether enforcement is considered in a proceeding in equity or at law).

5.2.    Adequate Assurances Regarding Executory Contracts. Following the Closing, Purchaser will be capable of satisfying the conditions in Sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code with respect to the Assumed Seller Contracts.

## ARTICLE VI
## BANKRUPTCY COURT MATTERS

6.1.    Bankruptcy Court Matters. On or before the fifth (5th) Business Day after the execution of this Agreement, the Seller shall file (or shall have filed) a motion or motions with the Bankruptcy Court seeking entry of (x) an order of the Bankruptcy Court regarding the transactions contemplated by this Agreement, establishing notice and service requirements to

creditors and parties in interest with respect thereto, approving the Expense Reimbursement as a super priority expense of administration, and approving the bidding procedures (the "Bidding Procedures" and such order (which shall be substantially in the form of Exhibit D hereto, with such changes thereto as the parties shall mutually approve, being referred to herein as the "Bidding Procedures Order"), and (y) an order of the Bankruptcy Court approving the sale of the Transferred Assets free and clear of all Encumbrances, and the Cure Costs pursuant to this Agreement substantially in the form of Exhibit E hereto (with such changes thereto as the Seller and the Purchaser shall mutually approve) (the "Sale Approval Order"). Seller shall give prompt notice to Purchaser of (i) any notice or other communication from any Person alleging that the consent of such Person which is or may be required in connection with the transactions contemplated hereby is not likely to be obtained prior to Closing, and (ii) any written objection or proceeding that challenges such transactions or the entry of the Sale Approval Order.

6.2.    Bidding Procedures. The Bidding Procedures Order shall be substantially in the form (with such changes thereto as the Purchaser shall approve) of Exhibit D hereto, and shall, among other matters:

(i)    approve the Expense Reimbursement;

(ii)    approve the Bidding Procedures;

(iii)    schedule a hearing to consider entry of the Sale Approval Order and provide that notice of such hearing be given to all of the Seller's creditors, interest holders of record, the IRS, all state/local taxing authorities in jurisdictions where the Seller has or may have any tax liability, and potential other purchasers identified by the Seller and otherwise in accordance with Bankruptcy Rule 2002; and

(iv)    approve the form of this Agreement.

6.3.    Sale Approval Order. The Sale Approval Order shall be substantially in the form of Exhibit E hereto (with such changes thereto as the Seller and the Purchaser shall mutually approve). The Purchaser agrees that it will promptly take such actions as are reasonably requested by the Seller to assist in obtaining the Sale Approval Order, including, furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by the Purchaser under this Agreement and demonstrating that the Purchaser is a "good faith" purchaser under section 363(m) of the Bankruptcy Code.

6.4.    Appeal. In the event the entry of the Bidding Procedures Order or the Sale Approval Order shall be appealed, the Seller and the Purchaser shall use their respective reasonable efforts to defend such appeal; provided, however, that the foregoing shall in no way limit any right of either party to terminate this Agreement pursuant to Section 11.1 and no such termination shall be deemed to be a violation if this Section 6.4. Notwithstanding anything to the contrary set forth herein, nothing herein shall negate or limit the requirement of a finding that the Purchaser is entitled to 363(m) protections.

6.5.    Assumed Seller Contracts  The Sale Approval Order shall authorize the Seller to assume the Assumed Seller Contracts and assign to Purchaser all Assumed Seller

{O1594628;12}                                            16

Contracts and the Purchaser shall be responsible for obligations of the Seller under all such Assumed Seller Contracts and for the Cure Costs of all monetary defaults with respect to all such Assumed Seller Contracts, all in accordance with and to the extent provided in this Agreement and the Sale Approval Order. No later than ten (10) Business Days after the date hereof, Seller shall deliver to Purchaser a true and complete list of all Seller Contracts and Transferred Assets, all of which shall be made available to Purchaser on or prior to such date. Purchaser shall first designate those Seller Contracts it seeks to have Seller assume and assign at any time and from time to time before the Closing. At any time and from time to time before the Closing, the Purchaser may, by written notice to Seller, elect to exclude from the transactions contemplated hereby any one or more of the assets (other than the Assumed Real Estate Loans which Purchaser shall assume in accordance with the terms of this Agreement) that would otherwise be Transferred Assets, in which case it shall immediately and for all purposes herein be deemed an Excluded Asset, and Schedules 2.1(a), 2.1(e) and/or 2.2(c) shall be deemed to be modified accordingly. There shall be no adjustment to the Purchase Price as a result of the Purchaser's election to exclude any one or more of the assets pursuant to this Section 6.5 except that the Purchaser shall not be required to make any payments for Cure Costs or any other amount or other Liability relating to any Excluded Contract. Notwithstanding any provision in this Agreement to the contrary, the Purchaser shall not be required to purchase, acquire or assume any Assumed Seller Contract or Permit (or any Liabilities thereunder) a true and complete copy of which has not been provided by the Seller to Purchaser prior to the date hereof. Notwithstanding any provision in this Agreement to the contrary, from and after the date hereof through the Closing Date, the Seller will not reject or take any action (or fail to take any action that would result in rejection by operation of law) to reject, repudiate, terminate or disclaim any Seller Contract without the prior written consent of the Purchaser.

    6.6.    Cure.  Unless the parties otherwise agree, the Purchaser shall, at or prior to the Closing and in accordance with the Sale Approval Order and the terms of this Agreement, cure any and all monetary defaults under the Assumed Seller Contracts which are required to be cured under the Bankruptcy Code, so that such Assumed Seller Contracts may be assumed by the Seller and assigned to the Purchaser in accordance with the provisions of section 365 of the Bankruptcy Code. The Purchaser shall be responsible for all Cure Costs required herein to be paid in connection with the assignment to the Purchaser of all Assumed Seller Contracts and such cure payments shall not result in corresponding reductions in the Purchase Price. To the extent necessary to obtain authorization therefore or otherwise as required by the Bankruptcy Court, the Purchaser shall promptly upon request provide evidence to the non-debtor party to the Assumed Seller Contracts of Purchaser's financial condition in order to satisfy the requirement under section 365 to provide adequate assurance of future performance of each of the Assumed Seller Contracts. The Seller, prior to the Closing, shall use its best efforts, including the filing and prosecution of any and all appropriate proceedings in the Bankruptcy Court, to establish the amount of the Cure Costs, if any, for each Assumed Seller Contract, in accordance with its books and records, and to obtain all consents with respect thereto contemplated hereby.

    6.7.    Competing Bids.  This Agreement is subject to approval by the Bankruptcy Court and the consideration by the Seller of higher or better competing bids (each a "Competing Bid").  From the date hereof (and any prior time) and until the transaction contemplated by this Agreement is consummated, the Seller is permitted to cause its Representatives and Affiliates to initiate contact with, solicit or encourage submission of any

inquiries, proposals or offers by, any Person (in addition to the Purchaser and its Affiliates, agents and Representatives) in connection with any sale or other disposition of the Transferred Assets. In addition, the Seller shall have the responsibility and obligation to respond to any inquiries or offers to purchase all or any part of the Transferred Assets and perform any and all other acts related thereto that are required under the Bankruptcy Code or other applicable Law, including, supplying information relating to the Business and the assets of the Seller to prospective purchasers. The parties agree that the Seller shall be entitled to consider and enter into one or more transactions in connection with a Competing Bid consistent with their fiduciary obligations as debtors in possession in the Bankruptcy Case. Seller and Purchaser acknowledge that this Agreement is the culmination of an extensive process undertaken by Seller to identify and negotiate a transaction with a bidder who was prepared to pay the highest or best purchase price for the assets of Seller while assuming or otherwise satisfying certain liabilities in order to maximize value for Seller's constituents. The overbid provisions and related bid protections are designed to facilitate a full and fair process designed to maximize the value of the Transferred Assets for the benefit of Seller's stakeholders.

ARTICLE VII
COVENANTS

7.1.    <u>Operation of the Business</u>.

(a)    Subject to any restrictions and obligations imposed by the Bankruptcy Court and as otherwise contemplated by this Agreement, the Seller will not engage in any practice, take any action or enter into any transaction outside the ordinary course of business between the date hereof and the Closing Date. In particular, between the date hereof and the Closing Date, without the prior written consent of the Purchaser, the Seller shall not, in respect of the Transferred Assets or the operation of the Business:

(i)    incur any Liability (other than connection with the performance of Assumed Seller Contracts) that would be or would increase an Assumed Liability as of or subsequent to the Closing;

(ii)    lease, license, surrender, relinquish, convey, assign, transfer, sell or otherwise dispose of any Transferred Assets or any interest therein, other than immaterial dispositions in the ordinary course of business;

(iii)    abandon any rights under any of the Assumed Seller Contracts, terminate, amend, modify or supplement the terms of any Assumed Seller Contract, or fail to honor or perform the Assumed Seller Contracts; mortgage, pledge or subject to Encumbrances (other than Permitted Encumbrances) any of the Transferred Assets; or fail to replenish the Inventory and supplies of the Business in the ordinary course of business;

(iv)    terminate any officer, director or employee other than in the ordinary course of business;

(v)    make or rescind any material Tax election or take any material Tax position (unless required by law) or file any Tax Return or change its fiscal year or financial or

Tax accounting methods, policies or practice, except in each case as would not reasonably be expected to materially affect the Purchaser;

(vi)    institute, settle or agree to settle any litigation, action or proceeding before any court or Governmental Body;

(vii)    modify, rescind or terminate a material Permit, allowance, or credit (or application therefor) relating to the Business or the Transferred Assets;

(viii)    dispose of or fail to keep in effect any material rights in, to, or for the use of any of the Intellectual Property, except for rights which expire or terminate in accordance with their terms; or

(ix)    enter into any contract to do any of the foregoing.

(b)    Notwithstanding anything in this Agreement to the contrary, this Section 7.1 shall not prevent the Seller from rejecting Seller Contracts that are not Assumed Seller Contracts. Neither Purchaser nor any of its Affiliates shall be liable for any claims arising from the rejection of such Contracts by Seller.

(c)    Seller shall give prompt notice to Purchaser of (i) any notice of any alleged violation of Law applicable to Seller, including any notice from any Governmental Body; (ii) the commencement of any investigation, inquiry or review by any Governmental Body with respect to the Business or that any such investigation, inquiry or review; (iii) the infringement or unauthorized use by any Person of any material Intellectual Property (of which Seller has Knowledge); and (iv) any changes in the capital spending plans of the Seller relating to the Business or the Transferred Assets that were made available to Purchaser on or prior to the date hereof.

7.2.    Expenses. Except as otherwise specifically provided herein, the Purchaser and the Seller shall bear their respective expenses incurred in connection with the preparation, execution and performance of this Agreement and the transactions contemplated hereby, including all fees and expenses of their Representatives. For the avoidance of doubt, as between the Purchaser and the Seller, the Seller shall bear all of the costs of administration of any Bankruptcy Case.

7.3.    Public Announcements. No party to this Agreement shall make, or cause to be made, any press release or public announcement in respect of this Agreement or the transactions contemplated hereby or otherwise communicate with any news media without prior written approval of the other party, which approval shall not be unreasonably withheld, conditioned or delayed, unless such disclosure is required by applicable Law. The parties shall cooperate, using commercially reasonable efforts, as to the timing and contents of any such announcement, including any such announcement required by applicable Law.

7.4.    Access to Information. From the date hereof until the Closing, upon reasonable notice, the Seller shall (i) afford the Representatives of the Purchaser access, during normal business hours, to the offices, plants, warehouses, properties, books and records of the Seller relating to the Business, and (ii) furnish to the Representatives of the Purchaser such

additional financial and operating data and other information regarding the operations of the Business as the Purchaser may from time to time reasonably request; provided that the Purchaser shall be bound by and shall comply with the terms of this Agreement with respect to the Purchaser's ability to use or disclose any such information. The Seller shall facilitate the Purchaser's contact and communication with the key employees and personnel of the Seller, customers, suppliers, vendors and distributors of the Business, all as requested upon reasonable notice by the Purchaser to the Seller and during normal business hours after the date hereof. The Seller shall direct its employees and personnel to cooperate with the Purchaser in connection with the foregoing. From the date hereof through the Closing, Seller will use its good faith efforts to operate the Business in such a manner as to achieve a smooth transition consistent with the mutual business interests of Seller and Purchaser. In this regard, Seller and Purchaser agree that they will enter into and continue good faith discussions concerning the Business, including, but not limited to, personnel policies and procedures, and other operational matters relating to the Business.

7.5.    Regulatory and Other Authorizations; Consents.

(a)    Each of the parties hereto shall use its commercially reasonable efforts to (i) take, or cause to be taken, all appropriate action, and do, or cause to be done, all things necessary under any Law or otherwise to consummate and make effective the transactions contemplated by this Agreement, (ii) obtain any consents, Permits, waivers, approvals, authorizations or orders required to be obtained or made in connection with the authorization, execution and delivery of this Agreement and the consummation of the transactions contemplated hereby, and (iii) make all filings and give any notice, and thereafter make any other submissions either required or reasonably deemed appropriate by each of the parties, with respect to this Agreement and the transactions contemplated hereby required under any Law.

(b)    The parties hereto shall work closely and cooperatively and consult with each other in connection with the making of all such filings and notices, including by providing copies of all such documents to the non-filing party and its advisors a reasonable period of time prior to filing or the giving of notice. The Purchaser shall pay, or reimburse the Seller, for all filing fees and other charges arising out of actions taken under this Section 7.6.

7.6.    Further Action. Each of the parties hereto shall execute such documents and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated hereby. From time to time after the Closing, the Seller shall prepare all documents and take all actions reasonably necessary to further the sale and assignment of the Transferred IP to the Purchaser hereunder. At the Closing, the Seller shall turn over actual possession and control of all of the Transferred Assets to the Purchaser by taking such action that may be required or reasonably requested by the Purchaser to effect such transfer of possession and control. To the extent that any Seller Contract or Permit to be transferred to the Purchaser pursuant to the terms hereof is not capable of being transferred to the Purchaser (after giving effect to the Sale Approval Order) without the consent of a third Person, or if such transfer or attempted transfer would constitute a breach thereof, nothing in this Agreement or in any document, agreement or instrument delivered pursuant to this Agreement will constitute a transfer or an attempted transfer thereof prior to the time at which all consents necessary for such transfer will have been obtained unless an order of the Bankruptcy Court effects such transfer

without consent. At the time of Closing, and subject to the approval of the Bankruptcy Court pursuant to the Sale Approval Order or such other order of the Bankruptcy Court and/or the consent of the applicable counterparties to the extent necessary to effect the assignment in any case, the Seller shall assume (to the extent required) and then assign to the Purchaser and the Purchaser shall assume from the Seller all the Assumed Seller Contracts. If a consent of any Person which is required in order to assign any Transferred Assets is not obtained prior to the Closing, or if an attempted assignment would be ineffective or would adversely affect the ability of Seller to convey its interest in question to the Purchaser, the Seller will cooperate with the Purchaser in good faith and in a commercially reasonable manner in any lawful arrangement reasonably requested by Purchaser to provide that the Purchaser shall receive the interests of Seller in the benefits of such Transferred Asset. If any consent is not obtained before the Closing and the Closing is nevertheless consummated, Seller agrees to continue to cooperate with the Purchaser in good faith and in a commercially reasonable manner to obtain all such consents as have not been obtained prior to such date. To the extent that any insurance policies owned or controlled by Seller covers any loss, Liability, claim, damage or expense resulting from, arising out of, based on or relating to occurrences prior to the Closing with respect to the Business and permits claims to be made thereunder with respect to such losses, Liabilities, claims, damages or expenses after the Closing, the Seller shall use commercially reasonable efforts to obtain an insurance certificate naming the Purchaser as an additional insured thereunder. The Seller grants to the Purchaser access to the Seller's administrative contact for the Seller's domain names and agrees to make such person available to the Purchaser and its representatives and agents to effectuate the transfer to the Purchaser of the domain names which constitute a Transferred Asset hereunder. From and after the Closing, (i) Seller shall promptly forward to Purchaser any and all payments received by Seller from customers or any other Persons, which constitute part of the Transferred Assets and (ii) Purchaser shall promptly forward to Seller any and all payments received by Purchaser from customers or any other Persons, which constitute part of the Excluded Assets.

      7.7.    Books and Records.

        (a)    If, in order to properly prepare documents required to be filed with Governmental Bodies or its financial statements, it is necessary that either party hereto or any successors thereto be furnished with additional information relating to the Business, the Transferred Assets or the Assumed Liabilities, and such information is in the possession of the other party hereto or any successor thereto or any of their respective Affiliates, such party agrees to furnish or cause to be furnished such information to such other party, at the reasonable cost and expense of the party being furnished such information.

        (b)    For a period of six years after the Closing Date (or such longer period as may be required by any Governmental Body or ongoing Claim), each party (the "Requested Party") shall allow the other party (the "Requesting Party") and any of its Representatives reasonable access to all employees and files of the Requested Party relating to the Business for the period preceding the Closing Date which are reasonably required by the Requesting Party in anticipation of, or preparation for, any existing or future legal proceeding involving the requesting party or any of its Affiliates or tax return preparation, during regular business hours and upon reasonable notice at the Requested Party's principal place of business or at any location where such records are stored, and the Requesting Party shall have the right, at its

own expense, to make copies of any such records and files; provided that any such access or copying shall be had or done in such a manner so as not to interfere with the normal conduct of the Requested Party's business or operations and shall be subject to reasonable confidentiality limitations.

       7.8.    Tax Matters.

          (a)    Sales, Use and Other Transfer Taxes.  The Purchaser shall provide the Seller with resale exemption certificates as is appropriate.  The Seller shall be responsible for all of the excise, sales, value added, use, registration, stamp, franchise, transfer and similar Taxes incurred in connection with the transactions contemplated by this Agreement and which are not otherwise exempt pursuant to the applicable sections of the Bankruptcy Code.  The parties hereto agree to cooperate in the filing of all necessary documentation and all Tax Returns with respect to all such Taxes, including any available pre-sale filing procedure.

          (b)    Cooperation.  The parties hereto shall cooperate with each other and with each other's respective Representatives, including accounting firms and legal counsel, in connection with the preparation or audit of any Tax Return(s) and any Tax claim or litigation in respect of the Transferred Assets and the Assumed Liabilities that include whole or partial taxable periods, activities, operations or events on or prior to the Closing Date, which cooperation shall include making available employees, if any, for the purpose of providing testimony and advice, or original documents, or either of them.

          (c)    Bulk Sales Law.  The Purchaser hereby waives compliance by the Seller with the requirements and provisions of any "bulk-transfer" Laws of any jurisdiction that may otherwise be applicable with respect to the sale and transfer of any or all of the Transferred Assets to the Purchaser.

       7.9.    Notification of Certain Matters.  Until the Closing, each party hereto shall promptly notify the other party in writing of any fact, change, condition, circumstance or occurrence or nonoccurrence of any event of which it is aware that will or is reasonably expected to result in any of the conditions set forth in Article VIII or IX of this Agreement becoming incapable of being satisfied.

       7.10.    Required Notices.  Seller shall give prompt notice to the Purchaser, of (i) the occurrence or non-occurrence of any event, the occurrence or non-occurrence of which would be reasonably likely to cause any of its representations or warranties in this Agreement to be untrue or inaccurate in any material respect at or prior to the Closing Date or to cause any condition precedent herein not to be satisfied on or prior to the Closing, (ii) any Material Adverse Effect with respect to itself, (iii) the cessation of employment with Seller of any employee and (iv) any failure of Seller to comply with or satisfy any covenant, condition or agreement to be complied with or satisfied by it under this Agreement.  Notwithstanding the foregoing, the delivery of any notice pursuant to this Section shall not (x) be deemed to amend or supplement any of the Disclosure Schedules contemplated hereby, (y) be deemed to cure any breach of any representation, warranty covenant or agreement or to satisfy any condition or (z) limit or otherwise affect the remedies available hereunder to the party receiving such notice.

7.11.   Use of Name.  From and after the Closing, the Seller agrees not to use any trademarks or trade names included within the Transferred Assets or any names reasonably similar thereto after the Closing Date in connection with any business related to, competitive with, or an outgrowth of, the business conducted by the Seller on the date of this Agreement.  No later than one Business Day following the Closing, Seller shall, and shall cause each of its Affiliates to, file amendments with the appropriate Governmental Bodies changing its corporate name, "doing business as" name, trade name, and any other similar corporate identifier to one that does not contain any of the Transferred IP, the names "CAMtech" or "CAMtech Precision Manufacturing" or any similar or confusing name.

7.12.   Employment.

As of the Closing, Purchaser shall in its discretion offer employment to the employees of the Seller who remain employed immediately prior to the Closing whom Purchaser desires to hire as employees to commence immediately following the Closing.  The employees who become employees of the Purchaser are referred to collectively herein as the "Rehired Employees".  The employment of the Rehired Employees by the Purchaser shall be on such terms of employment as Purchaser may determine, including, salaries and wages, health, welfare and other benefits, which may be different than prior to the Closing.

7.13.   Assumed Liabilities.  Subsequent to the Closing, upon the terms and subject to the conditions hereof and the Sale Approval Order, the Purchaser agrees to pay perform and discharge the Assumed Liabilities as they become due, including, without limitation, the discharge and performance when due of each and every obligation of the Seller to be satisfied or performed on or after the Closing Date, under the Assumed Seller Contracts and with respect to the Negotiated M&E Liabilities, the Assumed Real Estate Liabilities and accrued but unpaid payroll which is deemed to be an administrative cost.

ARTICLE VIII
CONDITIONS PRECEDENT TO OBLIGATIONS OF PURCHASER

The obligation of the Purchaser to consummate the transactions contemplated by this Agreement is subject to the fulfillment on or prior to the Closing Date of each of the following conditions, any one or more of which (to the extent permitted by applicable Law) may be waived by the Purchaser (provided that no such waiver shall be deemed to have cured any breach of any representation, warranty or covenant made in this Agreement):

8.1.   Representations and Warranties; Covenants.  The representations and warranties of the Seller contained in this Agreement shall be true and correct in all material respects (other than those representations and warranties that are qualified by materiality, which shall be true and correct in all respects) both as of the date of this Agreement and as of the Closing, other than such representations and warranties that are made as of a specified date, which representations and warranties shall be true and correct as of such date (except where such failure to be true and correct has been or will be cured, remedied or otherwise accounted for pursuant to the Sale Approval Order).  The covenants and agreements contained in this Agreement to be complied with by the Seller at or before the Closing shall have been complied with in all material respects.  The Purchaser shall have received a certificate of the Seller (the

"Seller's Certificate") to such effect signed by a duly authorized officer thereof, and certifying (a) copies of resolutions of the board of directors (or equivalent governing body) of Seller authorizing and approving the execution and delivery of this Agreement and the transactions contemplated hereby and the performance by Seller of its obligations hereunder and thereunder, certified by an officer of Seller, (b) an incumbency certificate dated as of the Closing Date for Seller, and (c) copies of the articles of incorporation and by-laws (or equivalent governance documents) of Seller.

8.2.    No Order.    No Governmental Body shall have enacted, issued, promulgated, enforced or entered any statute, rule, regulation, injunction or other order (whether temporary, preliminary or permanent) which is in effect and has the effect of (a) making the transactions contemplated by this Agreement illegal or otherwise restraining or prohibiting consummation of such transactions, materially limiting Purchaser's ability to own and operate the Business or which would be reasonably likely to have a Material Adverse Effect, (b) causing such transactions to be rescinded following the Closing or (c) materially modifying such terms (in each instance, unless satisfied or resolved or preempted by the Sale Approval Order). All terminations or expirations of waiting periods imposed by any Governmental Body necessary for the transaction contemplated by this Agreement, if any, shall have occurred.

8.3.    Bankruptcy Condition.    The Sale Approval Order shall have been entered by the Bankruptcy Court. If the Sale Approval Order shall have been appealed from, the Purchaser may agree to consummate the transaction notwithstanding the pendency of such appeal, provided that no stay thereof shall be in effect. The Bankruptcy Case shall not have been dismissed or converted to a proceeding under Chapter 7 of the Bankruptcy Code and no trustee or examiner shall have been appointed. The Bankruptcy Court shall have authorized the assumption and assignment of the Assumed Seller Contracts and the Assumed Seller Contracts shall have been actually assumed and assigned to Purchaser such that the Assumed Seller Contracts will be in full force and effect from and after the Closing with non debtor parties being barred and enjoined from asserting against Purchaser, among other things, defaults, breaches or claims of pecuniary losses existing as of the Closing or by reason of the Closing. The Sale Approval Order shall have become a Final Order and the Cure Costs having been finally fixed.

8.4.    Closing Documents.    The Seller shall have delivered to the Purchaser on the Closing Date the documents required to be delivered pursuant to Section 10.2.

8.5.    No Material Adverse Effect.    Since the date of this Agreement, there shall not have occurred any Material Adverse Effect.

8.6.    Required Consents.    Each of the Third Party consents set forth on Schedule 8.6 attached hereto (as to Assumed Seller Contracts or Permits) have been received by the Purchaser and are in full force and effect. All authorizations, consents, orders or approvals of, or declarations or filings with, any Governmental Body which are necessary to consummate the transactions contemplated hereby shall have been filed, been obtained or occurred and such authorizations, consents, orders or approvals shall not have expired or been withdrawn; and all terminations or expirations of waiting periods imposed (and any extension thereof) by any Governmental Body necessary for the transactions contemplated under this Agreement, if any, shall have occurred.

8.7.    Cure Costs. Unless the parties otherwise agree, the Purchaser shall have received written confirmation sufficient to establish that the aggregate Cure Costs do not exceed $225,000.

8.8.    Minimum Revenue Target. Seller shall have achieved the minimum revenue target set forth on Schedule 8.8 and shall have delivered to Purchaser as of Closing a certificate of Seller's controller certifying the same.

8.9.    Customer Retention. Seller shall not have lost customers from and after the date hereof accounting for more than $50,000 of its aggregate revenue for the twelve (12) months preceding the date hereof and shall have delivered to Purchaser as of Closing a certificate of Seller's controller certifying the same.

8.10.    Financing. Purchaser and/or its Affiliates shall have obtained financing on terms and conditions satisfactory to Purchaser in an amount sufficient to consummate the transactions contemplated hereby.

8.11.    Negotiated M&E Liabilities and Assumed Real Estate Liabilities. Each party under the operative agreements related to the Negotiated M&E Liabilities shall have agreed that Purchaser shall only be liable for the Negotiated M&E Liabilities and each party under the Assumed Real Estate Loans shall have agreed that Purchaser shall only be liable for the Assumed Real Estate Liabilities.

8.12.    Borrowing Base. The Borrowing Base shall be at least $850,000.

ARTICLE IX
CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLER

The obligation of the Seller to consummate the transactions contemplated by this Agreement is subject to the fulfillment on or prior to the Closing Date of each of the following conditions, any one or more of which (to the extent permitted by applicable Law) may be waived by the Seller (provided that no such waiver shall be deemed to have cured any breach of any representation, warranty or covenant made in this Agreement):

9.1.    Representations and Warranties; Covenants. The representations and warranties of the Purchaser contained in this Agreement shall be true and correct in all material respects (other than those representations and warranties that are qualified by materiality, which shall be true and correct in all respects) both as of the date of this Agreement and as of the Closing, other than such representations and warranties that are made as of a specified date, which representations and warranties shall be true and correct as of such date. The covenants and agreements contained in this Agreement to be complied with by the Purchaser at or before the Closing shall have been complied with in all material respects. The Seller shall have received a certificate of the Purchaser (the "Purchaser's Certificate") to such effect signed by a duly authorized officer thereof.

9.2.    No Order. No Governmental Body shall have enacted, issued, promulgated, enforced or entered any statute, rule, regulation, injunction or other order (whether temporary, preliminary or permanent) which is in effect and has the effect of making the

transactions contemplated by this Agreement illegal or otherwise restraining or prohibiting consummation of such transactions and which is not satisfied or resolved or preempted by the Sale Approval Order. All terminations or expirations of waiting periods imposed by any Governmental Body necessary for the transactions contemplated under this Agreement, if any, shall have occurred.

        9.3.    Bankruptcy Condition. The Sale Approval Order shall have been entered by the Bankruptcy Court. The Bankruptcy Case shall not have been dismissed or converted to a proceeding under Chapter 7 of the Bankruptcy Code and no trustee or examiner shall have been appointed. The Bankruptcy Court shall have authorized the assumption and assignment of the Assumed Seller Contracts and the Assumed Seller Contracts shall have been actually assumed and assigned to Purchaser such that the Assumed Seller Contracts will be in full force and effect from and after the Closing with non debtor parties being barred and enjoined from asserting against Purchaser, among other things, defaults, breaches or claims of pecuniary losses existing as of the Closing or by reason of the Closing. The Sale Approval Order shall have become a Final Order and the Cure Costs shall have become finally fixed.

        9.4.    Payment. The Purchaser shall have paid the Purchase Price in accordance with Section 3.1 hereof.

        9.5.    Closing Documents. The Purchaser shall have delivered to the Seller on the Closing Date the documents and payments required to be delivered by it pursuant to Section 10.3.

ARTICLE X
CLOSING

        10.1.    Closing. Subject to the terms and conditions of this Agreement and the Sale Approval Order, the closing (the "Closing") of the sale and purchase of the Transferred Assets and the assignment and assumption of the Assumed Liabilities contemplated by this Agreement shall take place remotely by electronic transmissions at 10:00 A.M., New York time, on the third (3rd) Business Day following the satisfaction or waiver of all conditions to the obligations of the parties set forth in Articles VIII and IX (other than those conditions which by their nature can only be satisfied at the Closing), or at such other place or at such other time or on such other date as the Seller and the Purchaser may mutually agree upon in writing (the day on which the Closing takes place being the "Closing Date"). The effective time of the Closing shall be 12:01 a.m. on the Closing Date.

        10.2.    Deliveries by the Seller. At the Closing, unless otherwise waived in writing by the Purchaser, the Seller shall deliver or cause to be delivered to the Purchaser:

            (a)    a duly executed copy of the Bill of Sale;

            (b)    a duly executed counterpart to the Assignment and Assumption Agreement;

            (c)    duly executed copies of the Assignments of Intangible Property;

        (d)     a duly executed Seller's Certificate pursuant to <u>Section 8.1</u>;

        (e)     employment and non-competition agreements duly executed by the Persons set forth in <u>Schedule 10.2(e)</u> hereto;

        (f)     a certified copy of the Sale Approval Order, as entered by the Bankruptcy Court;

        (g)     a certification pursuant to Treasury Regulations Section 1.1445-2(b)(2)(iv)(B) that the Seller is not a foreign corporation, foreign partnership, foreign trust or foreign estate or disregarded entity;

        (h)     estoppel certificates in a form reasonably acceptable to the Purchaser duly executed by each of the Persons listed in <u>Schedule 10.2(h)</u> hereto;

        (i)     to the extent any of the Transferred Real Property is Owned Real Property, a statutory warranty deed executed by the Seller conveying such Transferred Real Property to Purchaser, free and clear of all Encumbrances, except for Permitted Encumbrances;

        (j)     to the extent any of the Transferred Real Property is Owned Real Property, an affidavit or affidavits or other documents acceptable to Purchase and Purchaser's title agent, if any, as may be reasonably required by a title company or the title agent to issue a title insurance policy without standard exceptions (including exceptions for any gap and possible lien claims of mechanics, laborers and materialmen); and

        (k)     such other customary documents and instruments of transfer, assumptions and filings as may be reasonably required to be delivered by Seller to consummate the transactions contemplated hereby or otherwise give effect to this Agreement.

    10.3.   <u>Deliveries by Purchaser</u>.  At the Closing, unless otherwise waived in writing by the Seller, the Purchaser shall deliver or cause to be delivered to the Seller:

        (a)     an amount equal to the Cash Consideration by wire transfer of immediately available funds to an account (or accounts) designated by the Seller at least two (2) Business Days prior to the Closing Date;

        (b)     a duly executed counterpart to the Assignment and Assumption Agreement;

        (c)     a duly executed Purchaser's Certificate pursuant to <u>Section 9.1</u>; and

        (d)     such other customary documents and instruments of transfer, assumptions and filings as may be reasonably required to be delivered by Purchaser to consummate the transactions contemplated hereby or otherwise give effect to this Agreement.

    10.4.   <u>Allocation of Proceeds</u>.  On the Closing Date or on such other date as the Seller and the Purchaser may mutually agree upon, the Purchaser shall provide the Seller with a

proposed allocation of the Purchase Price (including any liabilities that are considered to be an increase to the Purchase Price for federal income tax purposes) among the Transferred Assets. If the Seller does not deliver a written notice disagreeing with the Purchaser's proposed allocation within 30 days following the Seller's receipt thereof, the proposed allocation shall be final. If the Seller delivers a written notice disagreeing with the Purchaser's proposed allocation within 30 days following the Seller's receipt thereof, the parties shall use commercially reasonable efforts to resolve such dispute within 30 days following the date of the dispute notice. If the Seller and the Purchaser are unable to resolve such dispute within such 30-day period, they shall refer such dispute to an independent accounting firm or appraisal firm jointly selected by the parties, whose determination shall be final and binding on the Seller and the Purchaser for all purposes of this Agreement. The parties agree to file (or cause to be filed) (i) all required federal Forms 8594, Asset Acquisition Statement under Section 1060, and (ii) all other Tax Returns (including amended Tax Returns and claims for refund) in a manner consistent with such allocation of the Purchase Price described herein. The parties agree to refrain from taking any position that is inconsistent with such allocation, and to use their commercially reasonable efforts to sustain such allocation in any subsequent Tax audit or Tax dispute.

ARTICLE XI
TERMINATION; TERMINATION PAYMENT

11.1.    Termination Prior to Closing.    Notwithstanding anything herein to the contrary, this Agreement may be terminated, and the transactions contemplated by this Agreement abandoned, at any time prior to the Closing, upon notice by the terminating party to the other party:

(a)    by the mutual written consent of the Seller and the Purchaser;

(b)    by either the Seller or the Purchaser if the Closing shall not have occurred prior to January 21, 2011 (the "Termination Date"); provided, however, that the right to terminate this Agreement under this Section 11.1(b) shall not be available to any party whose failure to fulfill any obligation under this Agreement shall have been the cause of, or shall have resulted in, the failure of the Closing to occur prior to such date;

(c)    (i) by the Seller, if the Purchaser breaches or fails to perform in any material respect any of its representations, warranties or covenants contained in this Agreement and such breach or failure to perform (A) would give rise to the failure of a condition set forth in Article IX, (B) has not been cured within ten (10) Business Days following delivery of written notice of such breach or failure to perform, and (C) has not been waived by the Seller; or (ii) by the Purchaser, if the Seller breaches or fails to perform in any material respect any of its representations, warranties or covenants contained in this Agreement and such breach or failure to perform (A) would give rise to the failure of a condition set forth in Article VIII, (B) has not been cured within ten (10) Business Days following delivery of written notice of such breach or failure to perform, and (C) has not been waived by the Purchaser;

(d)    (i) by the Seller, if any of the conditions set forth in Article IX shall have become incapable of fulfillment prior to the Termination Date, or (ii) by the Purchaser, if any of the conditions set forth in Article VIII shall have become incapable of

{01594628;12}                                28

fulfillment prior to the Termination Date; provided, however, that the right to terminate this Agreement pursuant to this Section 11.1(d) shall not be available if the failure of the party so requesting termination to fulfill any obligation under this Agreement shall have been the cause of the failure of such condition to be satisfied on or prior to the Termination Date;

(e)    by either the Seller or the Purchaser, if the Bankruptcy Court approves a sale, transfer or other disposition by the Seller of all or substantially all of the Transferred Assets of the Seller relating to the Business or all or a substantial part of any of the Transferred Assets in connection with a Competing Bid;

(f)    by either the Seller or the Purchaser, if there is any Law that makes consummation of the transactions contemplated hereby illegal or otherwise prohibited, or if any order permanently restraining, prohibiting or enjoining Purchaser or Seller from consummating the transactions contemplated hereby is entered;

(g)    by either the Seller or the Purchaser, if Seller shall announce any plan of reorganization or liquidation other than a plan that contemplates a sale of all or substantially all of the assets of the Business to Purchaser, or if Seller shall withdraw or seek to withdraw its motion seeking approval of the transactions contemplated hereby;

(h)    by either the Seller or the Purchaser, if the Case is converted from a case under Chapter 11 of the Bankruptcy Code to a case under Chapter 7 of the Bankruptcy Code without the prior written consent of Purchaser;

(i)    by the Purchaser, if the Bidding Procedures Order (A) shall not have been entered by the Bankruptcy Court on or prior to the tenth Business Day after the date hereof or (B) shall fail to be in full force and effect or shall have been stayed, reversed, modified or amended in any material respect without the prior written consent of Purchaser; or

(j)    by the Purchaser, if any fact, event, change or effect has occurred which, individually or in the aggregate, has resulted in a Material Adverse Effect.

11.2.    Effect of Termination; Remedies.

(a)    In the event of termination of this Agreement pursuant to Section 11.1, this Agreement shall have no effect and no party hereto shall have any liability to the other parties hereto or their respective Affiliates, directors, officers, employees, Representatives or shareholders, except for the obligations of the parties to this Agreement contained in this Section 11.2, Section 7.4 and Article XII, and except that nothing in this Agreement will relieve any party from liability for any intentional breach of any representation, warranty, covenant or agreement set forth in this Agreement or fraud prior to such termination.

(b)    If this Agreement is terminated pursuant to Section 11.1(a), 11.1(b), 11.1(d), 11.1(f), 11.1(i) or 11.1(j), then no party hereto shall have any liability to the other parties hereto or their respective Affiliates, directors, officers, employees, Representatives or shareholders.

(c)     If this Agreement is terminated pursuant to Section 11.1(h) and following such termination a subsequent transaction is consummated in which Seller sells or disposes of a majority of its assets for value (a "Post-Chapter 7 Sale"), Seller shall pay to Purchaser an amount equal to the Expense Reimbursement, simultaneously with the consummation thereof.

(d)     If this Agreement is terminated pursuant to Section 11.1(c)(i), then, within two (2) Business Days after such termination, Purchaser shall pay to Seller the Expense Reimbursement.

(e)     If this Agreement is terminated pursuant to Section 11.1(c)(ii), Section 11.1(e) or Section 11.1(g) then, within two (2) Business Days after such termination, Seller shall pay to Purchaser the Expense Reimbursement.

(f)     Any payments of the Expense Reimbursement under this Section 11.2 shall be made by wire transfer of immediately available funds to an account designated in writing by the party entitled to receive such payment.

11.3.   Exclusive Remedy.   The parties' sole and exclusive remedies for any claim arising out of or in connection with this Agreement shall be termination and payment as set forth in this Article XI absent fraud or intentional breach.

11.4.   Survival After Termination.   Notwithstanding anything in this Agreement to the contrary, the provisions of Sections 7.2, this Article XI and Article XII shall survive any termination of this Agreement.

ARTICLE XII
MISCELLANEOUS

12.1.   Amendment.   This Agreement may not be amended, modified or supplemented except by a written instrument signed by all of the parties to this Agreement.

12.2.   Notices.   Any notice, request, instruction or other document to be given hereunder by a party hereto shall be in writing and shall be deemed to have been given, (a) when received if given in person, (b) on the date of transmission if sent by facsimile or other wire transmission (with answer back confirmation of such transmission), (c) upon delivery, if delivered by a nationally known commercial courier service providing next day delivery service (such as Federal Express), or (d) upon delivery, or refusal of delivery, if deposited in the U.S. mail, certified or registered mail, return receipt requested, postage prepaid:

If to the Seller, addressed as follows:

1365 Park Lane South
Jupiter, FL 33458

Attn:  Ron Weaver

{01594628;12}                                30

Fax:  561 575 0795

with a copy to:

Brad Shraiberg
Shraiberg, Ferrar & Landau, PA
2385 NW Executive Center Drive
Suite 300
Boca Raton, FL 33431

Fax: 561 998 0047

If to the Purchaser, addressed as follows:

Camtech Acquisition Corp, LLC
Attn.: Wayne D. Reid, II
433 Langley Oaks Drive
Marietta, Georgia 30067

Fax: 770 216 2032

with a copy to:

Akerman Senterfitt
One Southeast Third Avenue
Suite 2500
Miami, Florida 33131
Attn: Martin G. Burkett
Fax: (305) 349-4762

or to such other individual or address as a party hereto may designate for itself by notice given as herein provided.

      12.3.   <u>Waivers</u>.   The failure of a party hereto at any time or times to require performance of any provision hereof shall in no manner affect its right at a later time to enforce the same.   No waiver by a party of any condition or of any breach of any term, covenant, representation or warranty contained in this Agreement shall be effective unless in writing, and no waiver in any one or more instances shall be deemed to be a further or continuing waiver of any such condition or breach in other instances or a waiver of any other condition or breach of any other term, covenant, representation or warranty.

      12.4.   <u>Counterparts and Execution</u>.   This Agreement may be executed in two (2) or more counterparts (delivery of which may be by facsimile or via email as a portable document format (.pdf)), each of which will be deemed an original, and it will not be necessary in making

proof of this Agreement or the terms of this Agreement to produce or account for more than one (1) of such counterparts.

      12.5.   <u>Headings</u>.  The headings preceding the text of the Articles and Sections of this Agreement and the Schedules hereto are for convenience only and shall not be deemed part of this Agreement.

      12.6.   <u>Applicable Law and Jurisdiction</u>.

      (a)   This Agreement and all Claims with respect thereto shall be governed by and construed in accordance with the federal bankruptcy law, to the extent applicable, and, where state law is implicated, the laws of the State of Florida without regard to any conflict of laws rules thereof that might indicate the application of the laws of any other jurisdiction.

      (b)   The Purchaser and the Seller irrevocably and unconditionally consent to submit to the jurisdiction of any state or federal court sitting in Miami-Dade County, Florida for any litigation arising out of or relating to this Agreement and the transactions contemplated hereby (and agree not to commence any litigation relating hereto except in the Miami-Dade County, Florida).

      (c)   Any and all service of process and any other notice in any such Claim shall be effective against any party if given personally or by registered or certified mail, return receipt requested, or by any other means of mail that requires a signed receipt, postage prepaid, mailed to such party as herein provided.  Nothing herein contained shall be deemed to affect the right of any party to serve process in any manner permitted by Law or to commence legal proceedings or otherwise proceed against any other party in any other jurisdiction.

      12.7.   <u>Waiver of Jury Trial</u>.  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

      12.8.   <u>Binding Nature; Assignment</u>.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns, but neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any of the parties hereto without prior written consent of the other parties (which shall not be unreasonably withheld or delayed); except (a) that the Purchaser may assign any of its rights (but not its obligations) hereunder to any Affiliate or wholly owned subsidiary, (b) the Purchaser may grant a security interest in its rights and interests hereunder to its lenders, (c) the rights and interests hereunder may be assigned to a trustee appointed under Chapter 11 or Chapter 7 of the Bankruptcy Code, (d) this Agreement may be assigned to any entity appointed as successor to the Seller pursuant to a confirmed Chapter 11 plan and (e) as otherwise provided in this Agreement.

      12.9.   <u>No Third Party Beneficiaries</u>.  This Agreement is solely for the benefit of the parties hereto and no provision of this Agreement shall be deemed to confer upon third parties any rights, remedies or Claims.

12.10. <u>Termination of Representations, Warranties and Covenants</u>.    All representations and warranties made by the Seller and the Purchaser in this Agreement shall terminate on the Closing Date upon the purchase of the Transferred Assets by the Purchaser and the Seller shall have no liability after the Closing Date for any breach of any representation or warranty.  All covenants and agreements shall lapse at, and be of no further force and effect following, the Closing unless otherwise specified by their terms.

12.11. <u>Entire Understanding</u>.  This Agreement, the Exhibits and the Schedules hereto (which shall remain in full force and effect) set forth the entire agreement and understanding of the parties hereto in respect to the transactions contemplated hereby and the Agreement, the Exhibits and the Schedules hereto supersede all prior agreements, arrangements and understandings relating to the subject matter hereof and are not intended to confer upon any other person any rights or remedies hereunder.   There have been no representations or statements, oral or written, that have been relied on by any party hereto, except those expressly set forth in this Agreement, the Exhibits and the Schedules.

12.12. <u>Partial Invalidity</u>.   Wherever possible, each provision hereof shall be interpreted in such manner as to be effective and valid under applicable Law, but in case any one or more of the provisions contained herein shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, such provision shall be ineffective to the extent, but only to the extent, of such invalidity, illegality or unenforceability without invalidating the remainder of such invalid, illegal or unenforceable provision or provisions or any other provisions hereof, unless such a construction would be unreasonable.

12.13. <u>Time is of the Essence</u>.  Time is of the essence in this Agreement, and all of the terms, covenants and conditions of this Agreement.

*(Signature Page Follows)*

**IN WITNESS WHEREOF,** the Parties have caused this Asset Purchase Agreement to be duly executed, as of the date first above written.

**PURCHASER**

**CAMTECH ACQUISITION, LLC**

By: _____
              Name:
              Title:

**SELLER**

**CAMTECH PRECISION MANUFACTURING, INC.**

By: _____
              Name:
              Title: